FILED

**IN THE
UNITED STATES DISTICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(ALEXANDRIA DIVISION)**

2022 NOV 14 A 9: 43

| | |
|---|---|
| MAJOR MIKE WEBB, D/B/A FRIENDS FOR MIKE WEBB (C00591537), D/B/A MAJOR MIKE WEBB FOR CONGRESS (H8VA08167), D/B/A ANGELS OF LIBERTY, D/B/A MAJOR MIKE WEBB FOR VA<br><br>    Petitioner, *Pro Se*<br><br>v.<br><br>CAPITAL INVESTMENT ADVISORS, LLC<br><br>    Respondent | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No. 1: 22 cv 1271

Petition for Declaratory and Injunctive Relief

## VERIFIED COMPLAINT IN PETITION FOR TEMPORARY RESTRAINING ORDER AND INJUNCTIVE RELIEF

1. Comes now Petitioner/Major Mike Webb, to bring an action for declaratory relief, as authorized under the *Declaratory Judgments Act*, 28 U.S.C. § 2201; *see also* Fed.R.Civ.Pro. 57, and under Fed.R.Civ.Pro. 65 for temporary restraining order and injunctive relief against the above named Respondent, Capital Investment Advisors, LLC, hereinafter referred to as "CapInvest", a defendant-appellant in the matter *Webb v. Fauci*, Record No. 21-8242 (U.S. 2022), presently pending before the U.S. Supreme Court, to prevent retaliatory conduct, in violation of 18 U.S.C. §§ 1513 and 1514,or in the alternative a stay in accordance with Fed.R.Civ.Pro. 62.

## Jurisdiction

2. Paragraph 1 is incorporated by reference.

3. In relevant part, 28 U.S.C. § 2201 provides that any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be

sought.

4.  In addition, in accordance with 28 U.S.C. § 1331, "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

<u>**Parties**</u>

<u>***Petitioner***</u>

5.  Paragraphs 1 through 4 are incorporated by reference.

6.  Petitioner, described in Article III Courts most recently as a "litigation hobbyist", Order, *U.S. Navy SEALs v. Biden*, Civil Action No. 4:21-cv-01236-O (N.D.Tex. May 23, 2022); Order, *State of Missouri v. Biden*, Record No. 22-30531 (5th Cir. August 1, 2022), with a penchant for "hot-button issues", according to the U.S. Attorney General, Informal App. Opp. Brief, *Webb v. Garland*, Record No. 2022-2065(Fed. Cir. 2022), and as possessing "passion", according to the President, as in evidence at Exhibit **A**, most notorious, according to progressives in chic coffee houses in Seattle, as "against current government efforts and recommendations for safety during the COVID-19 pandemic", Staff, "Mary Kadera: Democrat," *Progressive Voters Guide*, September 15, 2021.

7.  Petitioner is a resident of Arlington, Virginia, is, by birth right, an African American, and the great grandson of a Native American, who was a former resident of Danville, Virginia, before lawful marriage to her husband, a Jewish immigrant from Germany, and his grandfather was a franchise martyr, shot in the back of the head, just south of Danville, across the state line in present day Eden, North Carolina.

8.  With a great uncle who had served as a lieutenant under General John "Black Jack" Pershing in World War I, and a father who had served as the first Negro State Chaplain for the New Jersey National Guard, Petitioner is not only, by birth, a Negro, member of a suspect class, *Gray v. Commonwealth*, 274 Va. 290 (2001), but also a third generation

U.S. Army officer, currently in retirement, and has served in the 2nd Ranger Battalion, as well as having served as the most junior commissioned officer to have ever served as the Operations Officer for all U.S. Army strategic counterintelligence in the Continental United States (CONUS), a member of the Retired Reserve in the rank of major.

9. Petitioner is currently a litigant with cases before the federal courts in the District of Columbia, Virginia and Texas, but also with legal actions pending with the Department of the Navy (DoN), the Department of Defense (DoD), the Courts of the Commonwealth of Virginia, the Courts of the Commonwealth of Massachusetts and the Courts of the State of New York, all the last of which regarding the government response to the current public health crisis, including the first pandemic incident homicide case for which the Circuit Court for Chesterfield County has certified a matter to the Chief Justice for the State Supreme Court to convene a grand jury investigation into the death of Bishop Gerald Glenn, an early fatality of COVID-19. *Webb v. Davenport*, Case No. 041CL22W0307900 (Chesterfield Cir. 2022). *See also* Michelle Boorstein, "Prominent Virginia pastor who said 'God is larger than this dreaded virus' dies of covid-19", *Washington Post*, April 30, 2020; Michelle Boorstein, "Covid-19 has killed multiple bishops and pastors within the nation's largest black Pentecostal denomination," *Washington Post*, April 19, 2020.

10. Moreover, Petitioner, although he has never qualified for any ballot for federal office, *but see Webb v. SBE*, Case No. CL20-2459-00 (Richmond Cir. 2020); *In re: Major Mike Webb*, Civil Action No. 3:20CV734 (E.D.Va. 2020); *In re: Major Mike Webb*, Record No. 20-1997 (4th Cir. 2020), has been identified as a person who "has floated around the periphery of the Northern Virginia political scene for nearly the past decade, qualified for the School Board ballot", Scott Broadbeck, "Morning Notes: Candidate Adds Military Rank to His Name," *ARL Now*, June 10, 2021, and with regard to seeking federal office,

*see* 52 U.S.C. § 310101, local newspaper accounts concur that Petitioner is "not a serious option", Scott McCaffery, "Sun Gazette endorsement: Mary Kadera for Arlington School Board," *Arlington Sun Gazette/Inside NOVA*, September 23, 2021, and, according to the local press, "[d]espite our commenters' love of all things Webb, we've tried to temper our coverage of his candidacy in reasonable proportion to his base of support", because "[w]hile running as a write-in candidate for Congress this fall, the total write-in vote for the Eighth District of Virginia race was 0.3 percent." Scott Broadbeck, "Most-Read Arlington Stories of 2016 (#11-15); 13. Congressional Candidate's Apparent Porn Post Going Viral (18,390 views)," *ARL Now*, December 28, 2016.

11. While it is well-known that "[a]s for Kadera and Webb, neither is likely to be singing the blues over not being on the GOP sample ballot, as neither actively sought the party's endorsement," Scott McCaffery, "Republicans pass on endorsing School Board contender," *Arlington Sun Gazettte/Inside NOVA*, October 8, 2021, *but see* Scott McCaffery, "GOP still has long climb back to relevancy in county," *Arlington Sun Gazette/Inside NOVA*, November 12, 2021; Scott McCaffery, "Editor's Notebook: C'mon, local GOP, step it up a notch," *Arlington Sun Gazette/Inside NOVA*, June 24, 2022, Petitioner has been identified for promoting public charter schools, *see* Dan Brendel, "God Shed His Grace on Thee in Alexandria," *Alexandria Connection*, October 20, 2017[1].

---

[1] "The only two conservative speakers — Webb and Sailor — are black. So is Adam Roosevelt, who, though he did not attend, is the only Republican candidate in any of Alexandria and Arlington's House of Delegate districts. Only two black Democrats spoke at the forum, one of whom stood in for Del. Alfonso Lopez (D-49), who is not black. The other Democratic speakers were white men, albeit who specifically addressed racial equity: Bryan Porter, the Commonwealth's Attorney for Alexandria, and Attorney General Mark Herring both said they're proud of minority hiring in their offices.

Webb supports charter schools and said that Arlington's worst performing high school is also its most diverse. Sailor, a businessman with an established GOP pedigree, said there was time when black people were not allowed to own guns, and that he's "grateful" he learned to shoot and defend his family." *Id.*

**12.** Petitioner is currently the leading challenger against Delegate Alphonso Lopez, Majority Whip for the Democratic Caucus, in the 49th District for the 2023 elections.

**13.** In addition to litigation brought to save the name of Washington-Lee High School, *see Webb v. Murphy*, Case No. 013CL183260-00 (Arlington Cir. 2019), *cert. denied* Record No. 190420 (Va. 2019); *Webb v. Stamos*, Case No. CL19-221 (Arlington Cir. 2019); *Webb v. Carlton Condominiums Unit Owners Association*, Case No. CL18-2005/Record No. 1399-18-4 (Va. App. 2018), *on appeal* Record No. 1399-18-4 (Va. 2018), and has been identified as "a member of the Red Rose Rescue, a group aimed at defunding reproductive healthcare services", Staff, "Mary Kadera: Democrat," *Progressive Voters Guide*, September 15, 2021, https://progressivevotersguide.com/index.php/virginia/2021/general/mary-kadera (accessed June 25, 2022); *see also Webb v. Com.*, Case Number 1:18-cr-363 (Original Civil Case Number 1:18-cv-1251) (E.D.Va. 2019), *on appeal U.S. v. Webb*, Record No. 19-6403 (4th Cir. 2019); *Commonwealth. v. Webb*, Case No. GC17004518-00 (Alexandria 2018), *on appeal Webb v. Commonwealth*, Case Number CM18000020 (Alexandria Cir. 2018), *on appeal* Record No. 1780-18-4 (Va. App. 2018),

**14.** Further, Petitioner has been recognized as being "against current government efforts and recommendations for safety during the COVID-19 pandemic." Staff, "Mary Kadera: Democrat," *supra. See Webb v. Northam, et al.*, Case Number CL20001624 (Alexandria Cir. 2020), *on appeal*, Record Number 210536 (Va. 2021); *Webb v. Northam*, Civil Number Civil Action No. 3:20CV497 (E.D.Va. 2020), *on appeal* Record Number 20-1968 (4th Cir. 2020), *cert. denied* Record No. 21-6170 (U.S. 2021); *Webb v. Fauci*, Civil Action No. 3:21CV432 (E.D.Va. 2021), *on appeal* Record Number 212394 (4th Cir. 2021), *on petition for cert.* Record No. 8242; *Webb v. Fauci*, Record No. 21-6868 (U.S. 2022); *Webb v. National Archives*, Civil No.1:2022-cv-00432 (D.C. 2022); *Webb v.*

*OMB*, Civil Action No. 3:22-cv-00418 (E.D.Va. 2022). *See also In Re: Major Mike Webb/Webb v. Porter*, Case No. CL21001829 (Alexandria Cir. 2021), *on appeal* Record No. 220089 (Va. 2022), *on petition for certiorari* Record No. TBD (U.S. 2022); *Webb v. Northam*, Civil Action No. 3:2022-cv-00222 (E.D.Va. 2022), *on appeal* Record No. 22-1669 (4th Cir. 2022) and Record No. 22-1627; *In re: Major Mike Webb*, Record No. 22-1422 (4th Cir. 2022) *U.S. Navy SEALs v. Biden*, Civil Action No. 4:21-cv-01236-O (N.D.Tex. 2022), *on appeal* Record No. 22-10597 (5th Cir. 2022); *Webb v. Northam*, Record No. 21-8142 (U.S. 2022); *Webb v. U.S. Dist. Ct. for E.D.Va.*, Record No. 21-7806.

15. Petitioner has further brought multiple actions in defense of religious liberty; *see Webb v. Newman*, Civil Action No. 1:19-CV-00822 (E.D.Va. 2018); *Webb v. Beyer*, Civil Action No. 1:19-CV-00808 (E.D.Va. 2019), *on appeal* Record No. 19-2423 (4th Cir. 2020); *Webb v. Wilson*, Case No. CL20001769 (Alexandria Cir. 2020); *Webb v. City of Falls Church, et al.* ,Civil Action No. 1:22-cv-00668 (E.D.Va. June 17, 2022); *Webb v. Garland*, 1:2022-cv-01595 (D.C. 2022), in addition to a string of cases arising from a whistleblower complaint arising from an attempted bribe offer, in violation of 18 U.S.C. § 201. *Webb v. DoD,* Docket Number DC-3443-18-0299-I-1 (MSPB 2018); *Webb v. MSPB*, Record Number 2019-1130 (D.C. 2018); *Webb v. MSPB*, Case Number 20-100 (Fed.Cir. 2018); *Webb v. MSPB*, Case Number 1:19-cv-257 (E.D.Va. 2019)*, on appeal Webb v. MSPB*, Record Number 19-1436 (4th Cir. 2019).

### ***Respondent***

16. Paragraphs 1 through 15 are incorporated by reference.

17. Respondent, CapInvest, is a named defendant in the matter *Webb v. Fauci*, Civil Action No. 3:2021cv00432 (E.D.Va. 2021), *on appeal* Record No. 21-2394 (4th Cir. 2021), *on appeal* Record No. 21-8242 (U.S. 2021); *see also Webb v. Fauci*, Record No. 21-6868

(on application for prejudgment decision), commenced at the U.S. District Court for the Eastern District of Virginia on July 7, 2021.

18. Respondent had been joined as a defendant in an action seeking to obtain a response to a *Freedom of Information Act (FOIA)*, 5 U.S.C. § 552, which had been acknowledged as received by the White House on March 23, 2021, a provision that provides that "[a]ny person making a request to any agency for records under paragraph (1), (2), or (3) of this subsection shall be deemed to have exhausted his administrative remedies with respect to such request if the agency fails to comply with the applicable time limit provisions of this paragraph", 5 U.S.C. § 552(a)(6)(C)(i), and a provision under which, "[o]n complaint, the district court of the United States in the district in which the complainant resides, or has his principal place of business, or in which the agency records are situated, or in the District of Columbia, has jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant." 5 U.S.C. § 552(a)(4)(B).

19. Respondent CapInvest, like Facebook, Inc., hereinafter referred to as "Facebook", had been joined as defendants in the court-directed amended complaint, in which Facebook had, just four days after an announcement regarding the White House decision to flag what had been deemed as problematic social media accounts, *see generally* Steven Nelson, "White House 'flagging' posts for Facebook to censor over COVID 'misinformation'," *New York Post*, July 15, 2021, had permanently disabled Petitioner's social media account, expressly for "security reasons", unspecified, implicating itself in allegations of violations of the *Freedom of Access to Clinic Entrances (FACE) Act*, 18 U.S.C. § 248(a)(2), for the unlawful blocking Petitioner's access to a place of worship, a designated "safe place" during the current public health crisis.

20. Respondent CapInvest had been alleged in the Amended Complaint to have been engaged, as a member of an enterprise, and/or participant in a conspiracy, that had most recently began a retaliation campaign claiming an unsubstantiated nonpayment of an apparently lost money order in the amount of $500.00 for Webb's monthly rent, in malicious prosecution, that had resulted in various additional charges, coincidentally during the time and after Webb had qualified for the ballot for the Arlington Public School Board, during the 2021 election period.

21. Like co-defendant Facebook, as well as others named in the Amended Complaint, as well as the White House, and others named in the Original Complaint, Respondent CapInvest has elected a dubious right to remain silent throughout that federal litigation, not even issuing a reply to the U.S. Supreme Court regarding whether it had wished to waive oral argument during a matter brought on the shadow docket, *Webb v. Fauci*, Record No. 21-6868 (U.S. 2021), as well as on final appeal. *Webb v. Fauci*, Record No. 21-8242 (U.S. 2021).

## Brief Statement of the Case

22. Paragraphs 1 through 21 are incorporated by reference.

23. According to federal authorities, "the *Public Readiness and Emergency Preparedness Act (PREP Act)* provides immunity to qualified individuals", and a "*PREP Act* Declaration amendments preempt requirements that would result in a qualified person being unable to prescribe, dispense, or administer vaccines as authorized by the state or U.S. territory", while "provides for a Countermeasure Injury Compensation Program for certain individuals who sustain serious injuries or die from receiving the countermeasures." U.S. Department of Health & Human Services (HHS), "PREP Act Immunity from Liability for COVID-19 Vaccinators," *PHE*, April 13, 2021,

https://www.phe.gov/emergency/events/COVID19/COVIDvaccinators/Pages/PREP-Act-Immunity-from-Liability-for-COVID-19-Vaccinators.aspx (accessed April 28, 2021).

24. Moreover, under the terms of the *PREP Act*, "[w]hen the Secretary determines that a threat or condition constitutes a present or credible risk of a future public health emergency, the Secretary may issue a PREP Act declaration", and "[t]he declaration provides *immunity from liability (except for willful misconduct) for claims of loss* caused by, arising out of, relating to, *or resulting from the administration or use* of covered countermeasures to diseases, threats and conditions identified in the declaration." *Id.* (emphasis added)

25. In the Commonwealth, under the jurisprudence of products liability, "[t]he manufacturer of a chattel will be subject to liability when he (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous. *Featherall v. Firestone Tire & Rubber Co.*, 219 Va. 949, 252 S.E.2d 358 (1979) (citing *Restatement (Second) of Torts* § 388 (1965)).

26. Furthermore, as observed in *Jones v. Meat Packers Equip. Co.*, 723 F.2d 370 (1983), in the Commonwealth,

> a manufacturer's duty to warn about dangers associated with a product's use is governed by § 388 of the *Restatement (Second) of Torts* (1965). *See Featherall v. Firestone Tire & Rubber Co.*, 219 Va. 949, 962, 252 S.E.2d 358, 366 (1979). We have previously concluded that Virginia law includes comment n of § 388, "Warnings given to third person." *See Barnes v. Litton Indus. Products, Inc.*, 555 F.2d 1184, 1188 (4th Cir.1977). Comment n discusses various factors that determine whether giving a warning to a third person is sufficient to relieve the supplier of liability. These include the reliability of the third person as a conduit of the information and the magnitude of the risk compared with the burden imposed on the supplier by requiring that he directly warn all users. *See Russell v. G.A.F. Corp.*, 422 A.2d 989, 992–93 (D.C.1980).

27. According to news sources, minimizing the risk[2]:

> The cases, which total 226 people, *or about 0.00015% of the 141 million fully vaccinated American adults,* have occurred mainly in younger people below the age of 30 after they received their second dose of an mRNA vaccine, which would include either the Moderna or Pfizer shot, according to data from the CDC and NBC News.

> Since April 2021, there have been increased reports to the Vaccine Adverse Event Reporting System (VAERS) of cases of inflammation of the heart happening after mRNA COVID-19 vaccination (Pfizer-BioNTech and Moderna) in the United States.

> *It was still too early to determine whether those cases were caused by the vaccine or another factor.*

> *Many things can cause heart inflammation.* Common causes include viral or bacterial infections, such as the coronavirus itself, as well as medical conditions that damage the heart and cause inflammation. Vanessa Ruffes & (WCNC), James Brierton (WCNC), "CDC investigating 200+ cases of heart inflammation after COVID-19 vaccine," *KHOU,* May 27, 2021, *updated* June 11, 2021 (emphasis added).

> *But see* Mollie Mansfield, "RARE JAB RISK More than 280 teens & young men suffer heart inflammation after Pfizer or Moderna Covid jab – sparking CDC 'emergency'," *The Sun (U.S.),* June 11, 2021[3]; Melissa Jenco, "CDC confirms 226 cases of myocarditis after COVID-19 vaccination in people 30 and under," *AAP News,* June 10, 2021[4].

---

[2] "Swelling of the heart appears to be a very rare side effect that primarily strikes young people after vaccination for COVID-19, a CDC expert reported Thursday, detailing data on cases of myocarditis and pericarditis found through a government safety system.

The side effect seems to be more common in teen boys and young men than in older adults and women and may occur in 16 cases for every 1 million people who got a second dose, said Tom Shimabukuro, MD, deputy director of the CDC's Immunization Safety Office, who presented information on the cases to an expert panel that advises the FDA on vaccines." Brenda Goodman, "Evidence Ties COVID Vaccines to Heart Issue in Youth," *Web MD,* June 11, 2021.

[3] "'We clearly have an imbalance there,' Dr. Tom Shimabukuro, deputy director of the CDC's Immunization Safety Office, said on Thursday.

The overwhelming majority of the cases have occurred within a week of vaccination, Shimabukuro said.

*There were 283 observed cases of heart inflammation after the second vaccine dose in those aged 16 to 24 in the VAERS data.*

That compares with expectations of 10-to-102 cases for that age range based on US population background incidence rates, the CDC said." *Id.* (emphasis added)

[4] "*Zeroing in on the 475 people ages 30 and under reporting myocarditis or pericarditis to the Vaccine Adverse Event Reporting System (VAERS),* the most common symptoms were chest pain, elevated cardiac enzymes, ST or T wave changes, dyspnea and abnormal echocardiography/imaging.

*Among 285 cases with a known outcome, 270 were discharged,* most to their homes. About 81% have made a full recovery, and the rest had ongoing symptoms or unknown status. Fifteen are still hospitalized, including three in intensive care.

*There were 79 cases of myocarditis/pericarditis reported in teens ages 16 or 17 years after a second dose of vaccine, while the expected number was two to 19 cases, according to Dr. Shimabukuro. There were 196 cases*

28. Yet, it is clear that a total of only 41 cases by January 14, 2020, regarding a pneumonia of unknown etiology, with no fatalities, Staff, "Archived: WHO Timeline - COVID-19," WHO, April 27, 2020, https://www.who.int/news/item/27-04-2020-who-timeline---covid-19 (accessed January 15, 2020), with a total of only less than 27 linked to the Huanan Wholesale Seafood Market, in Wuhan, Mandy Zuo, *et al.*, "Hong Kong takes emergency measures as mystery 'pneumonia' infects dozens in China's Wuhan city," *South China Morning Post*, December 31, 2019 ("Over the past month, 27 patients in Wuhan – most of them stall holders at the Huanan seafood market. . ."); *but see* Amanda Woods, "Shrimp vendor at Wuhan market may be coronavirus 'patient zero'," *New York Post*, March 27, 2020 ("A Dec. 31 statement from the Wuhan Municipal Health Commission revealed that Wei was among the first 27 patients to test positive for COVID-19, and one of 24 cases with direct links to the seafood market.")[5], in "a scruffy complex of 1,000 stalls spread over an area the size of nine football fields, . . .the largest of its kind in central China, mostly supplying seafood to Wuhan's residents and restaurants", where, later, only a total of 33 out of 585 environmental samples were collected that indicated the presence of coronavirus disease 2019 (COVID-19), Jeremy Page, "Virus Sparks Soul-Searching Over China's Wild Animal Trade," *Wall Street Journal*, January 26, 2020, in the largest city in the central mainland, Maggie Hiufu Wong, "Wuhan: Inside the Chinese city at the center of the coronavirus outbreak," *CNN*, January 23, 2020 ("With a population of more than 11 million people according to government figures, Wuhan is the capital city of Hubei province and the biggest city in China's central region."), and 42nd largest city in the world, Staff, "Wuhan: The London-sized city where the virus began," *BBC*, January 23,

---

*in young adults ages 18-24 years, while eight to 83 were expected. The case rates per million doses for those age groups were 35 and 21, respectively.*" Id. (emphasis added)

[5] Upon the date of the first identified case of infection aboard the *U.S.S Theodore Roosevelt*, the territorial possession island of Guam, had a total of only 27 cases, while reporting their first fatality, a women aged 68, with underlying medical issues. *Daily Post Staff*, "1 death, 27 total cases," The Guam Daily Post, March 23, 2020.

2020[6], resulted in an alert to world public health authorities and sharing of the genetic

sequence around the world by January 12, 2020. Staff, "Archived: WHO Timeline -

COVID-19," *supra. But see* Karen Weintraub & Elizabeth Weise, "Deleted gene

sequences confirm coronavirus circulated before Wuhan seafood market," *USA Today*,

June 26, 2021.

29. "Since April 2021, increased cases of myocarditis and pericarditis have been reported in

the United States after mRNA COVID-19 vaccination (Pfizer-BioNTech and Moderna),

particularly in adolescents and young adults", Staff, "Clinical Considerations:

Myocarditis and Pericarditis after Receipt of mRNA COVID-19 Vaccines Among

Adolescents and Young Adults," *CDC*, May 28, 2021,

https://www.cdc.gov/vaccines/covid-19/clinical-considerations/myocarditis.html

(accessed June 27, 2021), and, even though recovered cache pages indicate that this risk

was known as early as February 11, 2020, as in evidence at Exhibit **B**; *but see* Alexander

Tin, "CDC plans meeting on rare heart inflammation following COVID-19 vaccines,"

*CBS News*, June 14, 2021[7], "[i]n honor of Juneteenth", it was reported that the "CDC's

---

[6] "Wuhan is the provincial capital of Hubei Province and the fifth largest city in China. Its name comes from 'the three towns of Wuhan' – Wuchang, Hankou, and Hanyang. The Triple Cities of China's Heartland are known as "Wuhan." Wuchang and Hankow are known to Westerners as the "Twin Cities of China," comparable to Saint Paul and Minneapolis of the United States. Hanyang. the third city of the Triple Cities is not so well known. Wuchang was the political, educational and cultural center; Hankou was the transportation hub and commerce and trade center; and Hanyang was the cradle of China's modern industry." Staff, "Wuhan," *Global Security*, https://www.globalsecurity.org/military/world/china/wuhan-city.htm (accessed June 27, 2021).
[7] *"The new details about myocarditis and pericarditis emerged first in presentations to a panel of independent advisers for the Food and Drug Administration,* who are meeting Thursday to discuss how the regulator should approach emergency use authorization for using COVID-19 vaccines in younger children.

After earning an emergency use authorization for its COVID-19 vaccine in Americans as young as 12 last month, Pfizer announced this week it had decided on doses to use in a clinical trial in children as young as 6 months old and hoped to submit data by October. Moderna said Thursday that it too had requested the FDA's permission to give its mRNA vaccine to adolescents.

While Pfizer has said they expect to wrap up trials for children as young as 2 by September, FDA officials have previously cautioned that authorizing vaccines for these age groups could take longer — "mid to late fall" at the earliest — citing the additional follow-up data needed for children after they receive the shots." *Id.* (emphasis added)

emergency[8] meeting that was to be held June 18, called only 7 days ago to deal with bad news, was peremptorily cancelled today, at the 11th hour", Meryl Naas, "CANCELLED: CDC's Emergency Advisory Committee meeting tomorrow to consider myocarditis and giving Covid vaccines to our youth," *AllTheNews*, June 17, 2021,

> Data on individuals aged 18 years old and under suggest that there is a relatively low attack rate in this age group (2.4% of all reported cases). Within Wuhan, among testing of ILI samples, no children were positive in November and December of 2019 and in the first two weeks of January 2020. From available data, and in the absence of results from serologic studies, it is not possible to determine the extent of infection among children, what role children play in transmission, whether children are less susceptible or if they present differently clinically (*i.e.* generally milder presentations). The Joint Mission learned that infected children have largely been identified through contact tracing in households of adults. Of note, people interviewed by the Joint Mission Team could not recall episodes in which transmission occurred from a child to an adult.

**30.** According to one medical news content provider:

> The issue of myocarditis weighed heavily on the Vaccines and Related Biological Products Advisory Committee's considerations of what kind and how much data might be needed to green-light use of a vaccine for COVID in children.
>
> *Because the rates of hospitalization for COVID are low in kids, some felt that the FDA should require at least a year of study of the vaccines in clinical trials*, the amount of data typically required for full approval, instead of the 2 months currently required for emergency use authorization. Others wondered whether the risks of vaccination — as low as they are — might outweigh the benefits in this age groupBrenda Goodman, "Evidence Ties COVID Vaccines to Heart Issue in Youth," *Web MD*, June 11, 2021. (emphasis added)

**31.** Low rates of hospitalization were considered to be sufficient justification to delay for a year a study on the myocarditis risk, *ibid.*, but with only one fatality in the Commonwealth, Scott Wise, "A timeline of the COVID-19 pandemic in Virginia," *WTVR*, May 28, 2021, *updated* May 29, 2021 [9], and 45 reported infections, Marie K Tomlin, "Governor Bans All Events Over 100 People, Coronavirus Cases Up to 45 in

---

[8] "The CDC first described the panel's session as an 'emergency meeting,' but later changed it to merely a 'COVID-19 meeting.' Previous times the advisors convened to discuss the pandemic — like their May 12th gathering to mull recommendations for Pfizer's COVID-19 vaccine in adolescents — were also described as 'emergency meetings.'"

[9] "Saturday, March 14, 2020: Virginia records its first COVID-19 death when a James City County man in his 70s died in the hospital." *Id.*

Va.," *WJJS*, March 15, 2020, at a time assessed to be a low risk, Staff, "Alexandria

Health Department Confirms First 'Presumptive Positive' Case of COVID-19," *City of*

*Alexandria*, March 14, 2020[10], there was sufficient cause found to justify a lockdown

response that by the time nonessential social gatherings had been prohibited for ten

persons or more, Maia Stanley (Capital News Service), " Northam orders public

gatherings limited to 10," *Fauquier Now*, March 17, 2020, would provide the direct and

proximate cause for unemployment claims catapulting from from  2,706 claims to 46,885.

Laura Peters, "Study projects Virginia unemployment to nearly double by the summer

due to COVID-19," *Business Leader*, March 25, 2020, cumulatively determined to be the

equivalent of a Hurricane Katrina in every state.  Mike Allen, "Axios PM," *Axios*, April

2, 2020; *see also* Tom Dempsey, Kolbie Satterfield & Kyley Schultz, "These 5 areas of

Northern Virginia say they aren't ready to reopen yet, despite Northam's plan," *WUSA9*,

May 9, 2020. ("Mayor Justin Wilson of Alexandria, who co-signed the letter, said that

after the city saw a 400% rise in unemployment since February, he knew businesses in the

area were eager to reopen.").

32. The impact upon the schools developed swiftly, after "Governor Northam declare[d] a

state of emergency due to COVID-19" on March 12, 2020, "[a]ll K-12 schools in Virginia

ordered to close for a minimum of two weeks" on March 13, 2020 and by March 23,

2020, "Governor Northam announced public schools would remain closed for the rest of

the school year", simultaneously announcing that "businesses like bowling alleys, gyms,

and theaters, would close due to the outbreak", with "Restaurants ordered to close dining

rooms." on March 24, 2020. Scott Wise, "A timeline of the COVID-19 pandemic in

Virginia," *supra*.

---

[10] "If you visited the Immanuel Chapel between February 26 and March 4 and were not contacted directly by AHD and asked to self-quarantine, you may have been exposed to the virus but are considered by the CDC to be at low risk." *Id.*

33. By issue of a warning, national public health authorities have at a minimum acknowledged a risk associated with the vaccines, but a risk no less substantial than the original presentation of COVID-19 within China and the response after its arrival was more than just a published warning.

34. The staged dosage administration for the vaccines acknowledge the fact that a simple introduction of the pathogen is insufficient to cause the human immune response system to develop a response sufficient to repel an infection, but with no known infectious dose, it was impossible for vaccine manufacturers to determine exactly how much greater than immune response would be required; hence, from the outset, it was known that the vaccine would be ineffective, even if efficacious, from preventing an infection from COVID-19, and under DHS, 591 U.S., at ___ (citation omitted), "[j]udicial review of agency action. . . is limited to 'the grounds that the agency invoked when it took the action'", nor has a reason been articulated as to why, in a legitimate state interest, any percentage of the population would be required to volunteer for an ineffective vaccine to address a pathogen that, under its pathology, and under both the *Emergency Use Authorization* and the *Defense Production Act*, would have to be a biological agent being deployed against a target of national security interest, and rendering its distribution not for those purposes, an unauthorized commitment under the Federal Acquisition Regulations. FAR § 1.602-3.

35. Moroever, pursuant to 18 U.S.C. § 242, "[w]hoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any person in any State, Territory, Commonwealth, Possession, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States. . . or by reason of his color, or race, than are prescribed for the punishment of citizens, shall be fined under this title or imprisoned not more than one year, or both"

36. Nonetheless, under the laws of the Commonwealth, "[e]xcept as otherwise provided in this chapter, if there is a material noncompliance by the tenant with the rental agreement or a violation of § 55.1-1227 materially affecting health and safety, the landlord may serve a written notice on the tenant specifying the acts and omissions constituting the breach and stating that the rental agreement will terminate upon a date not less than 30 days after receipt of the notice if the breach is not remedied in 21 days and that the rental agreement shall terminate as provided in the notice." Va. Code § 55.1-1245(A).

37. "If the tenant has been served with a prior written notice that required the tenant to remedy a breach, and the tenant remedied such breach, where the tenant intentionally commits a subsequent breach of a like nature as the prior breach, the landlord may serve a written notice on the tenant specifying the acts and omissions constituting the subsequent breach, make reference to the prior breach of a like nature, and state that the rental agreement will terminate upon a date not less than 30 days after receipt of the notice." Va. Code § 55.1-1245(E).

38. "If *rent* is unpaid when due, and the tenant *fails to pay rent* within five days after written notice is served on him notifying the tenant of his nonpayment, and of the landlord's intention to terminate the rental agreement if the rent is not paid within the five-day period, the landlord may terminate the rental agreement and proceed to obtain possession of the premises as provided in § 55.1-1251." Va. Code § 55.1-1245(F)[11].

---

[11] "If the rental agreement is terminated, the landlord may have a claim for possession and for rent and a separate claim for actual damages for breach of the rental agreement, reasonable attorney fees as provided in § 55.1-1245, and the cost of service of any notice under § 55.1-1245 or 55.1-1415 or process by a sheriff or private process server, which cost shall not exceed the amount authorized by § 55.1-1247, and such claims may be enforced, without limitation, by initiating an action for unlawful entry or detainer. Actual damages for breach of the rental agreement may include a claim for rent that would have accrued until the expiration of the term of the rental agreement or until a tenancy pursuant to a new rental agreement commences, whichever occurs first, provided that nothing contained in this section shall diminish the duty of the landlord to mitigate actual damages for breach of the rental agreement. In obtaining post-possession judgments for actual damages as defined in this section, the landlord shall not seek a judgment for accelerated rent through the end of the term of the tenancy.

In any unlawful detainer action brought by the landlord, this section shall not be construed to prevent the landlord from being granted by the court a simultaneous judgment for money due and for possession of the

**39.** Near the close of the business day, while Petitioner was not at home, on or about November 8, 2022, by notice posted on the door to the apartment residence of Petitioner, CapInvest informed him for the first time regarding a past due balance of $337.60, stating: "WITHIN FIVE (5) DAYS after service of this Notice, you are required to pay said rent in full in certified funds, cashier check or oney order or your account will be turned over to the attorney for collection of all unpaid back rent."

**40.** Respondent CapInvest, by and through this "Five Day Notice to Pay Rent or Quit", had advised Petitioner that, "[i]f you fail to pay all such rent within five (5) days after service of this Notice, the Landlord will institute legal proceedings against you to recover possession of said premises, to declare such rental agreement or lease agreement forfeited, to recover rent and damages for unlawful detention of the premises, and to recover attorney's fees and court costs."

**41.** Respondent CapInvest acknowledged receipt, on November 2, 2022, of a payment, by a total of three money orders, in the amount of $500.00, Check Number 19444098147, $500.00, Check Number 19444098146 and $456.00, Check Number 19444098147, totalling $1,456.00, which is the lease agreement amount indicated on Petitioner's lease agreement, and Petitioner has yet to have received any lease agreement amount, since his original occupation of the premises, but the notice reflects a new monthly lease agreement amount of $1,526.00, a difference of exactly $70.00, and Respondent CapInvest adds a late charge of $40.76, which, if a failure to repay rent would total an arrearage amount of only $110.76, not $448.36, as demanded in the Notice, and there is no statement describing the arrears balance of $337.60 for an eviction for failure of rent payment, under Va. Code § 55.1-1245(F) to apply.

---

premises without a credit for any security deposit. Upon the tenant vacating the premises either voluntarily or by a writ of eviction, security deposits shall be credited to the tenant's account by the landlord in accordance with the requirements of § 55.1-1226." Va. Code § 55.1-1251.

**42.** As of the end of August, it has been public knowledge that Petitioner is the leading

contender to challenger Arlington Democrat and House Majority Whip for the Democrat

Caucus Alphonso Lopez. *See* Press Release, "Good Ole Boy from Washington & Lee, or

Liberty Champion for Christ, Democrat Lopez Expects 'Company'," *MailChimp*, August

30, 2022, https://us4.campaign-

archive.com/?u=19577c9ae4b647f8026bf1b98&id=7b093fb988 (accessed November 10,

2022), and, upon information and belief, James Parmelee, Editor of the Northern Virginia

GOP.com Agenda Newsletter, and Grover Norquist, President of Americans for Tax

Reform, can confirm that on Wednesday, November 9, 2022, while completing errands in

the District of Columbia, as witnessed to his No Tax Pledge, Petitioner was not in his

residence during the day, while Brett Knutson, a resident of Terwilliger Place, a

community providing housing for veterans, and new location for the American Legion, as

well as a former resident of the Infinity Apartments with whom he had lunch, after

returning to the residence after 2:00 p.m., finding no Notice on his door before that time.

**43.** Upon information and belief, as late as October 19, 2022, Petitioner did not have any

outstanding totalling $337.60, and can provide copies, regarding his regular timely

payment of the amount in his lease agreement for rent.

### Claims: Declaratory Relief

**44.** Paragraphs 1 through 43 are incorporated by reference.

**45.** Other than a general claim in the Notice, Respondent CapInvest cannot substantiate any

arrearage in rent for an expedited eviction process, for which Petitioner is entitled to

declaratory relief, under *Declaratory Judgments Act*, 28 U.S.C. § 2201; *see also*

Fed.R.Civ.Pro. 57.

### Claims: Witness Retaliation

**46.** Paragraphs 1 through 45 are incorporated by reference.

47. Under 18 U.S.C. § 1514(1), a predicate offense under the federal racketeering statute, 18

U.S.C. . § 1961(1)(B),  "[a] United States district court, upon application of the attorney

for the Government, *shall issue a temporary restraining order prohibiting harassment of*

*a victim or witness in a Federal criminal case* if the court finds, from specific facts shown

by affidavit or by verified complaint, that there are reasonable grounds to believe that

harassment of an identified victim or witness in a Federal criminal case exists or that such

order is necessary to prevent and restrain an offense under section 1512 of this title, other

than an offense consisting of misleading conduct, or under section 1513 of this title." 18

U.S.C. § 1514(1).

48. Under 18 U.S.C. § 1513(a)(1),  "[w]hoever kills or attempts to kill another person with

intent to retaliate against any person for. . . (A) *the attendance of a witness or party at an*

*official proceeding, or any testimony given or any record, document, or other object*

*produced by a witness in an official proceeding*; or (B) providing to a law enforcement

officer any information relating to the commission or possible commission of a Federal

offense or a violation of conditions of probation, supervised release, parole, or release

pending judicial proceedings, shall be punished as provided in paragraph (2)." (emphasis

added)

49. As noted above, in the matter *Webb v. Davenport*, Case No. 041CL22W0307900

(Chesterfield Cir. 2022), on September 28, 2022, the Circuit Court had certified to the

Chief Justice for the State Supreme Court a matter to designate an impartial judge to

preside over a grand jury investigation regarding the death of Bishop Glenn, a matter

initiated by Petitioner.

50. Petitioner, who had most recently filed a complaint seeking a court martial for at least the

manslaughter of one crew member, DoN Inspector General Complaint

202204911/DCATAS 20220914-079637-Case-01, *see also generally* Blake Montgomery,

"First USS Roosevelt COVID-19 Victim Died With Sailor Wife by His Side," *Daily*

*Beast*, April 16, 2020; Ken Stone, "San Diego Wife Was by Side of *USS Roosevelt* Sailor

Felled by COVID-19," *Times of San Diego*, April 16, 2020; Gina Harkins, "Carrier

Roosevelt Sailor Who Died of COVID-19 Was 41-Year-Old Chief," *Military*, April 16,

2020[12], and had most recently initiated a complaint regarding violations of the *Espionage*

*Act*, DoN Inspector General Complaint 202205255, had been instrumental in obtaining an

inspector general report against Captain Brett Elliott Crozier who has quietly resigned,

abandoning a career path to an award of a star officer promotion, after being held at least

partially responsible for the infections of over 1,400 members of his crew, *Appendix F:*

*Analysis of USS Theodore Roosevelt (CVN 71): Binnacle List (Approved for Release)*,

U.S. Navy, dated May 13, 2020,

https://www.secnav.navy.mil/foia/readingroom/HotTopics/TR%20INVESTIGATION/7.

%20APPENDIX%20F%20-

%20Analysis%20of%20USS%20Theodore%20Roosevelt%20Binnacle%20List%20-

%20REDACTED%20FOR%20RELEASE.pdf (accessed October 1, 2020).

51. Petitioner, who has recently been granted a green light to proceed against late night talk

show host Jimmy Kimmel in a case brought under the federal racketeering statute, in an

action commenced in April, and quite an achievement even for a licensed attorney[13], had

---

[12] "He is survived by his spouse, a San Diego-based active-duty service member, who was by Thacker's side at the time of his death, according to a Navy news release. His spouse was flown to Guam through the Navy Air Logistics Office, arriving in Guam on April 11.

Thacker died two days later.

His family did not issue a statement, preferring to mourn their loss privately, Lt. Brittany Stephens, a Navy spokeswoman said. Capt. Carlos Sardiello, the *Roosevelt's* commanding officer, said the crew's thoughts and prayers are with Thacker's family.

'Our number one priority continues to be the health and well-being of all members of the *Theodore Roosevelt Strike Group* and we remain steadfast in our resolve against the spread of this virus,' Sardiello said in a statement." *Id.*
[13] Article III "Courts have described civil *RICO* as ' 'an unusually potent weapon—the litigation equivalent of a thermonuclear device." *Brookhaven Town Conservative Comm. v. Walsh*, No. 14CV6097JFBARL, 2016 WL 1171583, at *1–8 (E.D.N.Y. Mar. 23, 2016) (quoting *Katzman v. Victoria's Secret Catalogue*, 167 F.R.D. 649

recently, date stamped October 17, 2022, had acknowledged as received by the Ithaca

City Court a complaint directed against Cornell University, under the accusatory

documents provisions in the New York State Criminal Code, regarding the infections of

students at Cornell University, and has commenced a similar action with the police

department for Provincetown, Massachusetts regarding the less than forthcoming reports

published by the CDC with regard to the breakthrough infections outbreak that had

infected as many as a thousand gay men in July 2021, just a month before the approval of

the COVID-19 countermeasures, the descriptive nomenclature assigned in the *Emergency*

*Use Authorization Declaration*, on March 27, 2020.  85 Fed. Reg. 63, 182501, April 1,

2020[14].

52. Petitioner had requested permission to provide public comment at the last meeting of the

Arlington Public School Board on October 27, 2022, as in evidence at Exhibit **C**, but was

---

(S.D.N.Y. 1996) (quoting *Miranda v. Ponce Fed. Bank*, 948 F.2d 41 (1st Cir. 1991)), *aff'd*, 113 F.3d 1229 (2d
Cir. 1997). "'Because the 'mere assertion of a *RICO* claim ... has an almost inevitable stigmatizing effect on
those named as defendants, ... courts should strive to flush out frivolous *RICO* allegations at an early stage of the
litigation.'" *Brookhaven Town Conservative Comm.*, No. 14CV6097JFBARL, 2016 WL 1171583, at *1–8
(citing *Katzman*, 167 F.R.D. , at 649 (quoting *Figueroa Ruiz v. Alegria*, 896 F.2d 645, 650 (1st Cir. 1990)).
[14] "Before an EUA may be issued, the Secretary of HHS must declare that circumstances exist justifying the
authorization based on one of four determinations: (1) A determination by the Secretary of Homeland Security
that there is a domestic emergency, or a significant potential for a domestic emergency, involving a heightened
risk of *attack with a, chemical, biological, radiological, or nuclear ("CBRN") agent or agents*; (2) the
identification of a material threat by the Secretary of Homeland Security pursuant to section 319F-2 of the
Public Health Service (PHS) Act sufficient to *affect national security or the health and security of United States
citizens living abroad*; (3) a determination by the Secretary of Defense that there is a *military emergency, or a
significant potential for a military emergency, involving a heightened risk to United States military forces*,
including personnel operating under the authority of title 10 or title 50, of attack with (i) a *biological, chemical,
radiological, or nuclear agent or agents*; or (ii) an agent or agents that *may cause, or are otherwise associated
with, an imminently life-threatening and specific risk to United States military forces*; or (4) a determination by
the Secretary that there is a public health emergency, or a significant potential for a public health emergency,
that affects, or has a *significant potential to affect, national security or the health and security of United States
citizens living abroad, and that involves a CBRN agent or agents, or a disease or condition that may be
attributable to such agent or agents.*
Based on any of these four determinations, the Secretary of HHS may then declare that circumstances exist that
justify the EUA, at which point the FDA Commissioner may issue an EUA if the criteria for issuance of an
authorization under section 564 of the FD&C Act are met. The Office of the Assistant Secretary for
Preparedness and Response, HHS, requested that the FDA, HHS, issue an EUA for drugs and biological
products to allow the Department to take response measures based on information currently available about the
virus that causes COVID-19. The determination of a public health emergency, and the declaration that
circumstances exist justifying emergency use of drugs and biological products by the Secretary of HHS, as
described below, enable the FDA Commissioner to issue an EUA for drugs and biological products for
emergency use under section 564 of the FD&C Act." *Id.*

denied an opportunity to speak from a public body that had blocked him on email, as in evidence at Exhibit **D**.

53. Petitioner has requested an opportunity to provide public comment at the next meeting, scheduled on November 11, 2022, regarding a recent peer reviewed report, Joseph Fraiman, *Serious adverse events of special interest following mRNA COVID-19 vaccination in randomized trials in adults*, 40 Vaccine 40, pp. 5798-5805, September 22, 2022, Author links open overlay panel indicating that the mRNA COVID-19 countermeasures, mandated by the Arlington Public School Board for children, faculty, administration and staff, present a risk between 16% and 33%, depending upon the product, for serious adverse events, to include death, near death, disability, incapacitation, birth defects, and other medically significant events, as in evidence at Exhibit **E**, and the fact pattern triggers the time/decision rule articulated under *Reid v. MSPB*, 508 F.3d 674 (Fed. Cir. 2007), which provides that  to determine whether conduct is retaliatory, and the complainant need only demonstrate that "the deciding official knew of the [protected activity]. . . and that the adverse action was initiated within a reasonable time[15] of [the same]"[16].

54. It is generally acknowledged that hypothermia season commences on November 1st and runs through March 31st, and "The central mission of the hypothermia program is to provide safe, secure temporary housing and support to address an immediate crisis for homeless adults who would otherwise be living in conditions not meant for human

---

[15] *See Inman v. Department of Veterans Affairs*, 112 M.S.P.R. 280 (2009) (a reasonable time of 15 months); *Redschlag v. Department of the Army*, 89 M.S.P.R. 589 (2001) (a reasonable time of 18 months); *Russell v. DoJ*, 76 M.S.P.R. 317 (1997) (a reasonable time of 7 months); *Easterbrook v. DoJ*, 85 M.S.P.R. 60 (2000) (a reasonable time of 7 months).
[16] Under the timing/knowledge test, a complainant "need not demonstrate the existence of a retaliatory motive. . . to establish that [the protected activity]. . . was a contributing factor", *Kewley v. HHS*, 153 F.3d 1357 (Fed. Cir. 1998) (quoting *Marano v. DoJ*, 2 F.3d 1137(Fed. Cir. 1993)),  and "[o]nce the knowledge/timing test has been met, an administrative judge must find that the appellant has shown that. . . [the protected activity] was a contributing factor. . . . even if, after a complete analysis of all of the evidence, a reasonable factfinder could not conclude that the appellant's [protected activity]. . . was a contributing factor". *Schnell v. Department of the Army*, 114 M.S.P.R. 83 (2010).

-22-

habitation during *life-threatening temperatures*." Staff, *Standard Operating Procedures for Emergency Shelters During Hypothermia Season COVID-19 Pandemic Response* (February 2022). (emphasis added)

55. The Fourth Circuit has recently acknowledged a responsibility to be solicitous regarding the feeling of the mentally ill, particularly with regard to their dysphoric delusions, *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020), and, as a recipient of veterans compensation for disability, diagnosed with a major depressive disorder, particularly with the approaching of the observation of Veterans Day, it is of significance that "[i]n 2020, there were 6,146 Veteran suicide deaths," and "[t]he unadjusted rate of suicide in 2020 among U.S. Veterans was 31.7 per 100,000", Carl D. Mervyn, "VA releases 2022 National Veteran Suicide Prevention Annual Report," *Department of Veterans Affairs*, while at least the Courts of the Commonwealth of Massachusetts have recognized that it is reckless disregard for human life, meriting at least a conviction for manslaughter, to incite a mentally or emotionally person to suicide. *See Commonwealth v. Carter*, 474 Mass. 624 (July 1, 2016); Editor, *Trial Court Convicts Defendant of Involuntary Manslaughter Based on Encouragement of Suicide: Recent Case: No. 15YO0001NE (Mass. Juv. Ct. June 16, 2017)*, 131 Harv. L. Rev. 918, January 10, 2018; Ashley B. Chin, *Suicide by Text: The Case of Michelle Carter*, 21 J. Tech. L. & Pol'y 99, pp. 100–07 (2017); Melvin Huang, Keeping Stalkers at Bay in Texas, 15 Tex. J. C.L. & C.R. 53, 54–100 (2009).

56. And, under 18 U.S.C. § 1514(1), a district court would be required to issue a temporay restraining order, if presented by an attorney for the Government, where in violation of 18 U.S.C. § 1513(a)(1), any person or entity "kills or attempts to kill another person with intent to retaliate against any person for. . . (A) *the attendance of a witness or party at an*

*official proceeding, or any testimony given or any record, document, or other object*

*produced by a witness in an official proceeding".*

## **Claims: Racketeering**

**57.** Paragraphs 1 through 56 are incorporated by reference.

**58.** As noted above, Respondent CapInvest has yet to enter any appearance in the matter *Webb v. Fauci*, Record No. 21-6868 (U.S. 2021), as well as on final appeal. *Webb v. Fauci*, Record No. 21-8242 (U.S. 2021), and, under 18 U.S.C. 18 U.S.C. § 1512(1)(B), would also constitute a predicate offense under the federal racketeering statute. 18 U.S.C. § 1961(1)(B).

**59.** Under 18 U.S.C. § 2332b(a)(1)(A), "[w]hoever, involving conduct transcending national boundaries and in a circumstance described in subsection (b). . . kills, kidnaps, maims, commits an assault resulting in serious bodily injury, or assaults with a dangerous weapon any person within the United States. . . in violation of the laws of any State, or the United States, shall be punished as prescribed in subsection (c)", which provides, in relevant part, that "[w]hoever violates this section shall be punished. . . for a killing, or if death results to any person from any other conduct prohibited by this section, by death, or by imprisonment for any term of years or for life", 18 U.S.C. § 2332b(c)(1)(A).

**60.** However, under 18 U.S.C. § 2332b(b)(1)(C), for jurisdictional purposes, "the victim, or intended victim, is the United States Government, *a member of the uniformed services*, or any official, officer, employee, or agent of the legislative, executive, or judicial branches, or of any department or agency, of the United States" (emphasis added), and, to date, a total of 96 uniformed service members have been fatalities to COVID-19. Staff, "Spotlight: Coronavirus: DoD Response," https://www.defense.gov/Spotlights/Coronavirus-DOD-Response/ (accessed November 4, 2022).

61. A "'pattern of racketeering activity' requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity. 18 U.S.C. § 1961(5),  and under the federal racketeering statute, or *Racketeering Influenced and Corrupt Organizations (RICO Act)*, 18 U.S.C. § 1962(c), "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt", and "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." 18 U.S.C. § 1962(d).

62. Pursuant to 42 U.S.C. § 1985(2), "[i]f two or more persons in any State or Territory conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having so attended or testified, or to influence the verdict, presentment, or indictment of any grand or petit juror in any such court, or to injure such juror in his person or property on account of any verdict, presentment, or indictment lawfully assented to by him, or of his being or having been such juror; or if two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws. . . the party so injured or deprived may have an action for the recovery of

damages occasioned by such injury or deprivation, against any one or more of the conspirators."

63. Furthermore, in relevant part, pursuant to 42 U.S.C. § 1985(3), "[i]f two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

64. In a matter, now certified to the Virginia Supreme Court, to convene a grand jury, in the first pandemic incident homicide case in history, *Webb v. Davenport*, Case No. 041CL22W0307900 (Chesterfield Cir. 2022), an information, filed with the Commonwealth Attorney's Office, pursuant to Va. Code § 19.2-217 had presented evidence, beyond a reasonable doubt that, contrary to that which had been reported to a national audience, *i.e.*, "[a] prominent Richmond-area evangelical pastor died on the eve of Easter after contracting the novel coronavirus." Michelle Boorstein, "Prominent Virginia pastor who said 'God is larger than this dreaded virus' dies of covid-19," *Washington Post*, April 13, 2020, Bishop Gerald Glenn, "founder and leader since 1995 of the New Deliverance Evangelistic Church in Chesterfield, was the first black chaplain of that community's police department and was a police officer before becoming a

pastor," *Id.*, he did not simply die from COVID-19, a death of natural cause, or an act of

nature, but, rather, had been the victim of a biological agent about which, as of March 7,

2022, in the matter *Webb v. Fauci*, Record No. 21-6868 (U.S. 2022); *see also Webb v.*

*Fauci*, Record No. 21-8242 (U.S. 2022),  the White House can neither confirm, nor deny,

*see Phillippi v. CIA*, 655 F.2d 1325 (D.C. Cir. 1981), that the standard epidemiological

metrics, *i.e.* infectious dose and/or secondary attack rate, *see  Principles of Epidemiology*

*in Public Health Practice, Third Edition: An Introduction to Applied Epidemiology and*

*Biostatistics*, "Lesson 3: Measures of Risk: Section 2: Morbidity Frequency Measures,"

*CDC*, May 18, 2012, were classified information, which were part of a request, presented

under authority of the *Freedom of Information Act (FOIA)*, 5 U.S.C. § 552, acknowledged

as received by the White House on March 23, 2021.

65. "'Information' means any knowledge that can be communicated or documentary material,

regardless of its physical form or characteristics, that is *owned by, produced by or for, or*

*is under the control of the United States Government*." Part I, Section 1.1(b), Executive

Order 12,958, *Classified National Security Information*, April 17, 1995.  (emphasis

added)

66. Moreover, "'[i]nformation' means may information or material, regardless of its physical

form or characteristics, *that is owned by, produced by or for, or is under the control of the*

*United States Government*." Section 6.1(b), Executive Order No. 12,356, *National*

*Security Information*, April 2, 1982. (emphasis added)

67. In *Assoc. for Molecular Pathology v. Myriad Genetics, Inc.*, 569 U.S. 576 (2013), the

Supreme Court held "that a naturally occurring DNA segment is a product of nature and

not patent eligible merely because it has been isolated, but that cDNA is patent eligible

because it is not naturally occurring."

**68.** *A priori*, If this information is owned by, produced by or for, or is under the control of the United States government, despite reports to the contrary, by simple operation of law, as a product not of nature, it would, of necessity, have to have been cultivated in a laboratory. *Diamond v. Chakrabarty*, 447 U. S. 303 (1980); *Association for Molecular Pathology*, Docket No. 12-398, 566 U.S., at ___ .

**69.** Under the law, "one who aids and abets another in, or is accessory before the fact to, selfmurder is amenable to the law.'" *In re Extradition of Exoo*, 522 F. Supp. 2d 766 (S.D.W. Va. 2007) (quoting *State v. Willis*, 255 N.C. 473 (1961)). *See also generally* 18 U.S.C. § 2(a)[17].

**70.** However, in establishing proof of conspiracy, "'there must, *in addition to such knowledge or approval*, be voluntary, willing, knowing and intentional cooperation or agreement to cooperate before there can be any conspiracy'," *Id.* (quoting *Guinn v. U.S.*, 28 F. 103 (8th Cir. 1915)). And, furthermore, "once the conspiracy has been established, the government need show only 'slight evidence' that a particular person was a member of the conspiracy", *U.S. v. Elliott*, 571 F.2d 880 (5th Cir. 1978) (quoting *U.S. v. Morado*, 454 F.2d 167 (5th Cir. 1972), just as "'a party to a conspiracy need not know the identity, or even the number, of his confederates". *Id.* (quoting *U.S. v. Andolschek*, 142 F.2d 503 (2d Cir. 1944).

**71.** "In order to show withdrawal, 'the defendant must show that he has committed affirmative acts inconsistent with the object of the conspiracy that are communicated in a manner reasonably calculated to reach conspirators", *U.S. v. Heard*, 709 F.3d 413 (5th Cir. 2013 (quoting *U.S. v. Mann*, 161 F.3d 840 (5th Cir.1998) (quoting *U.S. v. Puig–Infante*, 19 F.3d 929 (5th Cir.1994)), and, to date, such affirmative acts have not been

[17] "Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal." *Id.*

-28-

demonstrated. "Mere cessation of activity in furtherance of the conspiracy is not sufficient to show withdrawal." *Id.* (citing *U.S. v. Torres*, 114 F.3d 520 (5th Cir.1997) (citing *U.S. v. Phillips*, 664 F.2d 971 (5th Cir. Unit B 1981)).

72. Furthermore, "[i]gnorance of any fact in the [defendants'] affairs which it is their duty to know can never be set up by them in defense or exculpation for any act which the existence of that fact should have prohibited", *Marshall v. Farmers' & Mechanics' Sav. Bank*, 85 Va. 676, 8 S.E. 586, 586–92 (1889), and the nation's highest court has said that a litigant is "chargeable with such knowledge as he might have obtained upon inquiry, provided the facts already known by him were such as to put upon a man of ordinary intelligence the duty of inquiry." *Johnson v. Standard Mining Co.*, 148 U.S. 360 (1893).

73. Further, "[t]he acts of a subordinate done in compliance with an unlawful order given him by his superior are excused and impose no criminal liability upon him *unless the superior's order is one which a man of ordinary sense and understanding would, under the circumstances, know to be unlawful, or if the order in question is actually known to the accused to be unlawful*." *U.S. v. Calley*, 22 U.S.C.M.A. 534 (1973).

74. Respondent has made no affirmative acts to communicate disavowal, has engaged in a conspiracy to evade a summons, tampering with a government witness, and further engaged to retaliate against a government witness, and, hence, establishing a pattern of racketeering activity, as a member of an enterprise against Petitioner's campaign committee, which would also qualify as a violation under the state business conspiracy statute, common law conspiracy, and the state racketeering statute.

75. Moreover, as a direct beneficiary, and practicing attorney, Delegate Lopez is aware, or should be aware that "the principle which justifies suits against individual defendants, who, under color of the authority of unconstitutional legislation by the state, are guilty of personal trespasses and wrongs, nor to forbid[ding] suits against officers in their official

capacity either to arrest or direct their official action by injunction or mandamus, where
such suits are authorized by law, and the act to be done or omitted is purely ministerial, in
the performance or omission of which the plaintiff has a legal interest." *Ex parte Ayers*,
123 U.S. 443 (1887).

## Claims: Injunction, Temporary Stay and Temporary Restraining Order

76. Paragraphs 1 through 75 are incorporated by reference.

77. Respondent CapInvest has expressly indicated an intent to pursue legal actions against
Petitioner, and, in the Commonwealth, a court may "first judge the tendered pleading
against the 'Indicia of Vexatiousness'", *In re Scott*, 80 Va. Cir. 558 (2010).

78. "The distinctive nature of an action for abuse of process, as compared with the actions for
malicious prosecution and false imprisonment, is that it lies for the improper use of a
regularly issued process, not for maliciously causing process to issue, or for an unlawful
detention of the person." *Glidewell v. Murray-Lacy & Co.*, 124 Va. 563 (1918).

79. "In order to be liable on a claim for malicious prosecution, "process must be issued for
the purpose of bringing the accused before a court, an indictment must be returned, or the
person must be arrested." *Mayberry v. Ememessay, Inc.*, 201 F. Supp. 2d 687 (W.D. Va.
2002) (quoting *Almy v. Grisham,* 55 Va.Cir. 401 (2001)).

80. Accordingly, Respondent CapInvest has expressed an intent to violate the requirements
for signed pleadings, under Va. Code § 8.01-271.1, which provides that "[t]he signature
of an attorney or party constitutes a certificate by him that (i) he has read the pleading,
motion, or other paper, (ii) to the best of his knowledge, information and belief, formed
after reasonable inquiry, it is well grounded in fact and is warranted by existing law or a
good faith argument for the extension, modification, or reversal of existing law, and (iii)
it is not interposed for any improper purpose, such as to harass or to cause unnecessary
delay or needless increase in the cost of litigation," or an intent, on the basis of no

substantiated evidence, nor foundation in law, to mount a vexatious litigation in abuse of

process against Petitioner, and, at least one infamous tribunal found dispositive that "[t]he

excuse given by the Accused in his evidence (Session 81, Vol. IV, p. xxxx5), that all he

did was to pass on a message which he received from Cracow, is not plausible, because

undoubtedly he knew the value of the tale about 'administration of tonics,' to which he

put his signature." *Government of Israel v. Eichmann*, 36 I.L.R. 5 (Supreme Court of

Israel, 1961).

**81.** Under the rule stated in *Thompson v. Bacon*, 245 Va. 107, 425 S.E.2d 512 (1993),

> A party alleging fraud must prove by clear and convincing evidence (1) a false
> representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with
> intent to mislead, (5) reliance by the party misled, and (6) resulting damage to him.
> *Winn v. Aleda Constr. Co.*, 227 Va. 304, 308, 315 S.E.2d 193, 195 (1984). Clear and
> convincing evidence is such proof as will establish in the trier of fact a firm belief or
> conviction concerning the allegations that must be established. *Walker Agency, Inc. v.
> Lucas*, 215 Va. 535, 540-41, 211 S.E.2d 88, 92 (1975).

**82.** By and through its Notice, Respondent CapInvest has presented a false statement

regarding the characterization of a past due sum as rent, and without any substantiating

evidence to establish the validity of the claim, material facts, made with intention and

knowingly, with intent to mislead, placing Petitioner in detrimental reliance thereupon,

threatening with homelessness during Hypothermia Season, at the commencement of a

political campaign for the state legislature, a patent act of retaliation, and abuse of

process, constituting irreparable harms in injury to Petitioner's rights to free speech, of

which a political campaign has been  recognized as the highest expression thereof,

because "it can hardly be doubted that the constitutional guarantee has its fullest and most

urgent application precisely to the conduct of campaigns for political office", *Monitor

Patriot Co. v. Roy*, 401 U. S. 265 (1971), and that "a candidate's expenditure of his

personal funds directly facilitates his own political speech", n.58, *Buckley v. Valeo*, 424

U.S. 1 (1976).

**Prayer for Relief**

**83.** Paragraphs 1 through 82 are incorporated by reference.

**84.** For the reasons stated above, invoking strict scrutiny, under authority of the *Declaratory Judgments Act*, 28 U.S.C. § 2201; *see also* Fed.R.Civ.Pro. 57, prays this Honorable Court grant an order to declare the encumbrance, in the amount of unpaid rent void and invalid, terminating the abuse of process commenced by Respondent CapInvest, in retaliation.

**85.** For the reasons stated above, under strict scrutiny, invoking the time/decision rule, Petitioner prays this Honorable Court at a minimum, shift the burden to compel Respondent CapInvest to show cause.

**86.** For the reasons stated above, invoking strict scrutiny, Petitioner, under authority of Fed.R.Civ.Pro. 65, prays this Honorable Court grant injunctive relief against the encumbrance alleged by Responent CapInvest, and/or in the alternative, grant Petitioner a stay against enforcement by Respondents, under authority of Fed.R.Civ.Pro. 62.

**87.** For the reasons stated above, under strict scrutiny, Petitioner prays this Honorable Court grant further relief through award of damages against Respondent CapInvest, under theories of common law conspiracy, violations of the Virginia business conspiracy statute, Va. Code §§ 18.2-499 to 500, the federal racketeering statute, the last two of which entitling Petitioner award of treble damages.

**88.** For the reasons stated above, under strict scrutiny, under authority of 42 U.S.C. § 1985(1), prays this Honorable Court grant an order, entitling Petitioner to "the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators", and reasonable costs, inclusive of attorney's fees, as dictated under authority of 42 U.S.C. § 1988(b).

89. For the reasons stated above, under strict scrutiny, under authority of Va. Code § 8.01-38.1, prays this Honorable Court grant punitive damages against Respondent CapInvest, not to exceed $350,000.

90. For the reasons stated above, under strict scrutiny, Petitioner prays this Honorable Court invoke its inherent powers, in review of this action, to grant at least award of attorney fees for defense against this anticipated abuse of process, and further award such other equitable remedies as deemed proper, to include financial sanctions, against Respondent CapInvest.

91. For the reasons stated above, under strict scrutiny, as summarized in Counts One through Nine, Petitioner, under authority of this Honorable Court's inherent powers, prays this Honorable Court grant such other equitable relief as deemed proper in the inherent and supervisory powers of this court for the administration of justice.

## **CERTIFICATION**

92. Paragraphs 1 through 91 are incorporated by reference.

93. I declare under penalty of perjury that the foregoing is true and correct.

Name of Party (Print or Type): Major Mike Webb, 955 S. Columbus Street, Unit # 426, Arlington, Virginia 22204, GiveFaithATry@gmail.com, 856-220-1354.

Signature of Party                                    Executed on: _11-13-2_ (Date)

Subscribed, acknowledged and sworn to before me, the undersigned Notary Public in the

County of _Alexandria_____, in the Commonwealth of Virginia, this

_10th_ day of _november_____, 20_22_

_Mayara Vale Renggli_
NOTARY PUBLIC

My commission expires: _06|30|2026_  Registration Number: _7975070_

MAYARA VALE RENGGLI
NOTARY PUBLIC
REG. #7975070
COMMONWEALTH OF VIRGINIA
MY COMMISSION EXPIRES JUNE 30, 2026

-33-

**PAGE INTENTIONALLY LEFT BLANK**

FILED

**IN THE**
**UNITED STATES DISTICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**(ALEXANDRIA DIVISION)**

2022 NOV 14  A 9: 43

MAJOR MIKE WEBB, D/B/A FRIENDS      )
FOR MIKE WEBB (C00591537), D/B/A    )
MAJOR MIKE WEBB FOR CONGRESS        )
(H8VA08167), D/B/A ANGELS OF        )
LIBERTY, D/B/A MAJOR MIKE WEBB      )
FOR VA                              )
    Petitioner, *Pro Se*             )
                      )      Civil Action No.  1: 22 CV 1271
    v.                               )
                      )
CAPITAL INVESTMENT ADVISORS,        )
LLC                                 )
    Respondent                       )      Petition for Declaratory and Injunctive
                      )      Relief
                      )

## LOCAL RULE 83.1(M) CERTIFICATION

I declare under penalty of perjury that:

No attorney has prepared, or assisted in the preparation of this Verified Complaint in Petition for Declaratory and Injunctive Relief.

Name of Party (Print or Type):  Major Mike Webb, 955 S. Columbus Street, Unit # 426, Arlington, Virginia 22204, GiveFaithATry@gmail.com, 856-220-1354.

Signature of Party

Executed on: 11-10-22 (Date)

Subscribed, acknowledged and sworn to before me, the undersigned Notary Public in the

County of _Alexandria_____, in the Commonwealth of Virginia, this 10ᵗʰ

day of _november_____, 2022

NOTARY PUBLIC

My commission expires: 06/30/2026 Registration Number: 7975070

MAYARA VALE RENGGLI
NOTARY PUBLIC
REG. #7975070
COMMONWEALTH OF VIRGINIA
MY COMMISSION EXPIRES JUNE 30, 2026

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRIGINIA
_____ Alexander DIVISION

FILED

_____ Webb _____
Plaintiff(s),

2022 NOV 14  A 9: 43

v.

_____ Capital Treastuff Advisors LLC _____
Defendant(s).

Civil Action Number: 1:22-CV-1271

## LOCAL RULE 83.1(M) CERTIFICATION

I declare under penalty of perjury that:

No attorney has prepared, or assisted in the preparation of_____ Complaint _____.
(Title of Document)

_____ Major M. Ice Webb _____
Name of *Pro Se* Party (Print or Type)

_____ [signature] _____
Signature of *Pro Se* Party

Executed on: _____ 11-10-22 _____ (Date)

OR

The following attorney(s) prepared or assisted me in preparation of _____.
(Title of Document)

_____
(Name of Attorney)

_____
(Address of Attorney)

_____
(Telephone Number of Attorney)
Prepared, or assisted in the preparation of, this document

_____
(Name of *Pro Se* Party (Print or Type)

_____
Signature of *Pro Se* Party

Executed on: _____ (Date)